ASPINWALL MANUF'G Co. *v.* GILL and another.

*(Circuit Court, D. New Jersey.*   July 18, 1887.)

1. PATENTS FOR INVENTIONS—LICENSE—EXTENT OF.
    A defendant in an action for the infringement of a patent pleaded a license to make 100 of the patented machines.   The evidence showed that he had made 125.   *Held,* that he was not protected by the license as to the excess over 100, although the patentee had delayed the defendant, and prevented his making the 100 according to his contract, and caused him damage thereby.
2. SAME—ASSIGNMENT—FUTURE IMPROVEMENTS.
    Where a patentee assigned his patent for $12,000, "together with all the improvements I may hereafter make, without further cost," the assignee is entitled to make and sell the original inventions as improved after his assignment.
3. SAME—ASSIGNMENT—RIGHTS OF ASSIGNEE.
    An assignee of a patent, whose assignment is properly recorded, is protected as to all of his rights thereunder, as against a subsequent assignee of the patentee.
4. SAME—INFRINGEMENT—ACTION BY PART OWNER.
    A part owner of a patent cannot maintain an action for infringement against another part owner.
5. SAME—IMPROVEMENT—WHAT CONSTITUTES.
    The patent No. 276,994, issued to Lewis A. Aspinwall, May 8, 1883, of a potato planter, was merely an improvement of patent No. 235,401, issued to the same inventor, December 14, 1880, and was not for a separate and different machine, as the difference in the two machines consisted simply in making the barbs which speared the potatoes, and carried them to the dropping place, straight, instead of hooked, and thus facilitating the action of the device.

In Equity.   On planter patents.
*Francis Forbes,* for complainant.
*F. C. Lowthorp, Jr.,* for defendants.

BRADLEY, Justice.   The bill in this case was filed to restrain the infringement of two certain patents, and to recover profits and damages for the infringement thereof.   The patents sued on were granted to Lewis Augustus Aspinwall for improvements in potato planters,—one dated December 14, 1880, and numbered 235,401, but subject to the limitation prescribed by section 4887, Rev. St. U. S., by reason of a British patent for the same invention, dated October 27, 1874, and July 30, 1878; the other patent sued on was dated May 8, 1883, and numbered 276,994.   By separate deeds of assignment bearing date September 19,

1885, the said Aspinwall assigned said patents, and all claims and demands against any party for infringing the same, to the complainant. The bill alleges infringement by the defendants, and prays the usual relief. The defendants set up two grounds of defense: a license from Aspinwall, and an assignment of a part interest in the patents themselves.

1. The license relied on was pleaded in this wise: They allege that about the first of January, 1882, Aspinwall, after having obtained the first of the patents sued on, and made application for the other, and having, as he asserted, obtained letters patent from the governments of Great Britain and of Germany for improvements in potato planters, agreed with the defendants for the construction and sale by them of 100 machines containing the said improvements, and also 100 machines known as potato diggers. The answer states that the object of this agreement was to bring the machines into notice, and to introduce them into common use; and that, in pursuance of the agreement, the defendants expended a large amount of money under the direction of said Aspinwall, who, in violation of his agreement, left the works of defendants in August, 1882, and forbade them to make any more machines. They deny that they have ever constructed or used or sold any machines except those constructed upon the express order of Aspinwall prior to said agreement, or in pursuance thereof afterwards.

The evidence in the case shows that such an agreement was made as stated in the answer; and that Aspinwall superintended the making of machines in the defendants' works at Trenton, during the year 1882, until some time in August of that year, when the parties had a difficulty, which resulted in Aspinwall's leaving, and forbidding the defendants to manufacture any more machines. I am not satisfied, from the evidence, that Aspinwall was justified in his conduct. I think the right to complete the manufacture of 100 machines remained in the defendants, and that they cannot be called to account in this suit for completing and disposing of the same. It is also very clear that Aspinwall, during the years 1883, 1884, and 1885, endeavored to embarrass the defendants in disposing of the machines made by them, by announcing that they had no right to manufacture them, threatening suits against purchasers, etc. All this was sufficient to excuse the defendants in some delay in completing the 100 machines. But the evidence is very clear that they had manufactured and disposed of the full number before this suit was commenced, and that they had undertaken the manufacture of several more. Bennington Gill himself testifies that they had made and sold 85 machines before the commencement of the suit; that they had made in all 125, all of which, except about a dozen, were entirely completed. Of course, the defendants cannot pretend that their license to build 100 machines gave them any right to build any more than that; and it is clear, therefore, that in making the remaining 25 machines they were acting without authority. The defense of license is good, and has been maintained as to the 100 machines, but no more. As to the others, this defense fails. If Aspinwall was guilty of misconduct in trying to embarrass the defendants in the disposal of their 100 machines, he may have

made himself liable to an action for damages; but he did not thereby extend the license beyond 100 machines.

2. The other defense set up in the answer is part ownership of the patents sued on, alleged to have been acquired by the defendants by virtue of certain assignments. It seems that in 1869 Aspinwall obtained certain letters patent for a potato planter, dated November 30 of that year, and numbered 97,339, which contained at least some of the elements embraced in the two patents now sued on. On the fifteenth of January, 1870, he assigned this patent to 11 persons (including himself as one) by an instrument of which the following is a copy, to-wit:

"IMPROVEMENT IN POTATO PLANTERS, No. 97,339.

"What I claim as my invention, and desire to secure by letters patent, is: (1) A spear, or spears, provided with trips; (2) operating the trips, substantially as described; (3) the V-shaped concave, C, constructed and used in the manner described; (4) swinging the plow and covers from the main frame, substantially as described, and for the purposes set forth.
"L. AUGS. ASPINWALL.

"Whereas, L. Augustus Aspinwall, of Albany, N. Y., did on the thirtieth day of November, 1869, obtain letters patent for the United States of America, securing him, his heirs, administrators, or assigns, for the term of seventeen years, the sole right to make, vend, and sell to others, to be used, the said improvements; and whereas, D. H. Wyckoff, Stacy P. Conover, Joseph H. Holmes, Joseph J. Thompson, John I. Thompson, Jonathan Longstreet, George Schanck, Garret R. Schanck, Daniel Smock, David Schenck, Jr., L. A. Aspinwall, are desirous of obtaining an interest in said invention, this is therefore to certify that I, L. Augustus Aspinwall, do hereby set, sell, and convey over to said parties my entire right and title in said patent for the following territory, viz., the United States of America, without reserve, for the sum of twelve thousand dollars, the receipt of which is hereby acknowledged, together with all improvements I may hereafter make, without further cost.

"Witness my hand and seal the fifteenth day of January, 1870.

    [Signed]             "L. AUGUSTUS ASPINWALL. [L. S.]
"Witnesses: JONATHAN LONGSTREET.
          "GEORGE SCHANCK."

This instrument was duly recorded in the patent-office, November 3, 1882.

On the eighth day of November, 1882, four of the parties named in the previous assignment, to-wit, David H. Wyckoff, Stacy P. Conover, Joseph H. Holmes, and Jonathan Longstreet, assigned and transferred unto George Schanck, (another of said parties,) his heirs and assigns, all their right, title, and interest in the said patent, No. 97,339, conveyed by the previous assignment, and to the assignment of the patent added the following words, to-wit:

"And we, the parties of the first part, do relinquish and quitclaim all interest or claim of whatsoever nature or description which we now have or hold in the said patent 97,339, unto the said George Schanck, his heirs and assigns, forever."

This instrument of assignment was recorded in the patent-office, February 28, 1883.

On the thirteenth day of December, 1882, a deed of assignment was made by the said George Schanck, both for himself and as heir at law of Garret R. Schanck, and by Joseph I. Thompson and John I. Thompson, to the defendant Bennington Gill, whereby they assigned to him all right and title in said patent No. 97,339, dated November 30, 1869, and in and to all improvements on said ʼinvention made after said date by said Aspinwall, or that might be made, as fully and completely as it was vested in them. This assignment was also recorded in the patent-office, February 28, 1883.

It thus appears that in December, 1882, the defendant Bennington Gill became the assignee of eight of the 11 persons to whom Aspinwall assigned the said patent in January, 1870.

Now, the contention of the defendants is that the patents sued on—granted, as before stated, one on December 14, 1880, and the other on May 8, 1883—are for mere improvements upon the potato planter, which was patented by the previous patent of November 30, 1869; and that by the assignment executed by Aspinwall on the fifteenth of January, 1870, whereby he assigned the last-named patent, with the addition of the words, "*together with all improvements I may hereafter make,*" the inventions set forth and secured by the patents of 1880 and 1883 are covered and conveyed; and therefore that the defendant Bennington Gill is in fact the owner of eight-elevenths of the patents sued on; and that the complainant corporation, as assignee of Aspinwall, is the owner of only one-eleventh part of the same. If this position of the defendants be correct, it is evident that the present suit cannot be maintained. For, even if the assignment of improvements to be made *in futuro* does not convey a legal interest in a patent taken out for such future improvement, yet, if valid at all, it certainly conveys an equitable interest, entitling the assignee to call upon the holder of the legal interest for an assignment thereof to the extent of the equity.

That such assignments of future improvements upon a machine, in connection with the assignment of a patent for such machine, are valid, is settled, I think, by the case of *Littlefield* v *Perry*, 21 Wall. 226. A naked assignment or agreement to assign, in gross, a man's future labors as an author or inventor,—in other words, a mortgage on a man's brain, to bind all its future products,—does not address itself favorably to our consideration. It is something like engagements of an expectant heir, binding the property which he may afterwards inherit, which are always looked upon with disfavor by the law. But where a man purchases a particular machine secured by a patent, and open to an indefinite line of improvements, it is often of great consequence to him that he should have the benefit of any future improvements that may be made to it. Without that, the whole value of the thing may be taken away from him the next day. A better machine might be made by the inventor, and sold to another party, which would make the machine acquired by the first purchaser entirely useless. These things happen every day. And hence it has become the practice, in many cases, to stipulate for all future improvements that may be made by the same inventor upon any particu-

lar machine which he induces a party to purchase from him, sometimes by way of license to use such improvements, and sometimes by way of purchase and ownership thereof. Where the inventor is connected in business with the party making such stipulation, or is interested in the profits arising from the business in which the invention is used, the arrangement seems to be altogether unobjectionable. But such a connection or interest does not seem to be necessary to the validity of such bargains. If based upon a valuable consideration, they are sustained as collateral or incidental stipulations connected with the conveyances of a principal subject.

Here was a sale of a patent for the solid sum of $12,000, upon a stipulation to have the benefit of all future improvements; which means, of course, all future improvements upon the machine which was the subject of the patent conveyed. The consideration was a valuable one. probably of great consequence to Aspinwall at the time. He may not have anticipated then how much better the machine could be made, how great improvements it was capable of, how valuable it would come to be. It was as perfect then as he knew how to make it. He may have estimated at low value any possible future improvements. But, whatever were his views, he was willing to make the bargain, and did make it. I do not see how he can avoid being bound by it; and, if he is bound, his assignee, the complainant, is in no better plight, for the assignment was put on record long before the complainant became owner of the present patents.

But the complainant meets this defense by denying that the machine covered by the present patents is an improvement upon the old machine covered by the patent of 1869; on the contrary, the complainant contends that it is altogether a new machine, working on a different principle. It cannot be denied, however, that both are potato planters; that both are erected on a two-wheeled vehicle, which is drawn along by a tongue, like a cart; that both have a hopper into which the potatoes are deposited preparatory to planting; that both have a passage-way, called a "concave," for the potatoes to pass into, where they are taken up by the machinery, one at a time; that the device for taking them up is a series of spears attached to a disk which is caused to revolve by the movement of the wheels of the cart; and that these spears' are carried, as the disk revolves, successively, to the potatoes lying in the passage-way or concave, and each spear impales a potato, and carries it up and around to a tripping device, which throws the potato off of the spear, and into a conductor that carries it to the ground. The new machine is better than the old one, no doubt; the spears are differently arranged, so as to secure a potato more certainly every time; and other improvements are adopted; but to say that it is not an improvement on the old machines is to abandon the dictates of common sense for the transcendental distinctions of ingenious theory. The principal ground for denying the new machine to be an improvement of the old, is the difference in the arrangement of the spears; the old spear being bent like a hook, so as to strike the potato tangentially, and the new one being straight, nearly in

line with the radius of the disk to which it is fastened. This is a difference in form, but not in principle. The object in both cases is to spear the potato. By the old method, you strike it with the hooked spear; by the new, you hold the potato while the spear enters it. The last is much the better device, no doubt, but in both you spear the potato. The last plan of doing it is an improvement on the old plan; that is all. The patent-office and patent experts may make two classes, if they please, and call one a hooked-spear class, and the other a radial-spear class; but that cannot settle the matter. These classifications are entirely arbitrary, and may descend to infinitesimal differences. The broad common sense of the thing is the only true criterion of the rights of the parties, and of the legal rules by which they are to be decided.

In my opinion, the machine as described in the patents of 1880 and 1883 is but an improvement upon the machines as described in the patent of 1869, within the true sense and meaning of the word "improvements," as used in the assignment of January 15, 1870.

Under this view of the effect of the assignment, the bill, of course, must be dismissed. The owner of one-eleventh of a patent cannot sue the owner of eight-elevenths of it for an infringement, even though the ownership of the latter be only an equitable interest. It is the duty of the legal owner to transfer to the equitable owner his rightful share of the property. The exact mutual rights of part owners of a patent have never yet been authoritatively settled. If one part owner derives a profit from the patent, either by using the invention, or getting royalties for its use, or purchase money for sale of rights, it would seem that he should be accountable to the other part owners for their portion of such profit. And probably a bill for an account would be sustained therefor. But this is matter of mere speculation, so far as this case is concerned. It is clear, I think, that one part owner cannot maintain suit against another for infringement.

The bill is dismissed, with costs.